ENTER JS-6 SEND



FILED - WESTERN DIVISION
CLERK, U.S. DISTRICT COURT

JUN 1 5 2006

CENTRAL DISTRICT OF CALIFORNIA
BY                    DEP

ENTERED
CLERK, U.S. DISTRICT COURT

JUN 1 6 2006

CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

CC LASC BC 336839
w/docket & Letter
y Remand

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

GONZALES & GONZALES BONDS
AND INSURANCE AGENCY, INC., a
California Corporation; and LIDIA
ORELLANA, individually and on behalf
of the general public,

Plaintiffs,

vs.

ACTION INTERNATIONAL
INSURANCE, INC.., d/b/a ACTION
IMMIGRATION BONDING, a Florida
corporation; ACTION BAIL BONDS,
INC., a Florida corporation; ROBERT
PRAEGER; JUDY PRAEGER;
FIDELITY NATIONAL PROPERTY &
CASUALTY INSURANCE CO., a New
York corporation; BANKERS SURETY
SERVICES, INC., a Florida corporation;
ROBERT ROY STEVENS, JR., an
individual, d/b/a BUST ME OUT BAIL
BONDS, and also d/b/a ROBERT
STEVENS BAIL BONDS; LEXINGTON
NATIONAL INSURANCE COMPANY,
a Maryland corporation; and DOES 1-
1000,

Defendants.

CASE NO. CV 06-01644 MMM (RCx)

ORDER GRANTING PLAINTIFFS'
MOTION TO REMAND

On July 20, 2005, plaintiff Gonzales & Gonzales Bonds and Insurance Agency, Inc.

("G&G") filed this action in state court.  G&G and Lidia Orellano filed a first amended complaint on November 16, 2005, and a second amended complaint on February 15, 2006.

Defendants removed the action to federal court on March 17, 2006.  Two weeks later, on March 31, 2006, plaintiffs filed a motion to remand the action.  For the reasons explained below, the court grants plaintiffs' motion and remands the case to state court.

# I. FACTUAL BACKGROUND

## A.    The Parties

G&G is a California corporation with its principal place of business in Los Angeles.[1] Lidia Orellana is a California citizen who resides in Los Angeles.[2]  Plaintiffs bring this action individually and behalf of the general public.

The second amended complaint names eight defendants.  Defendants Action International Insurance, Inc. d/b/a Action Immigration Bonding ("Action Immigration") and Action Bail Bonds, Inc. ("Action Bail") are Florida corporations that have their principal places of business in Fort Lauderdale.[3]  Roger and Judy Prager are Florida citizens who are officers, directors, and shareholders of Action Immigration and Action Bail.[4]  Fidelity National Property & Casualty Company ("Fidelity National") is a New York corporation that has its principal place of business in Chicago, Illinois.[5]  Bankers Surety Services, Inc. ("Bankers Surety") is a Florida corporation based in St. Petersburg, while Lexington National Insurance Corporation ("Lexington") is a Maryland corporation based in Baltimore.[6]  Robert Roy Stevens, Jr. d/b/a Bust Me Out Bail

---

[1]Second Amended Complaint, ¶ 1.

[2]*Id.*, ¶ 2.

[3]*Id.*, ¶¶ 3, 4.

[4]*Id.*, ¶¶ 5, 6.

[5]*Id.*, ¶ 7.

[6]*Id.*, ¶¶ 8, 9.

1  Bonds, and also d/b/a Robert Stevens Bail Bonds ("Stevens") is a resident of Orange County,

2  California. At the relevant times, Stevens purportedly owned and operated two bail bond

3  websites, http://www.robertstevensbailbonds.com and http://www.insbailhelp.com.[7]

4  **B.    General Allegations Relating To Immigration Bonds**

5  This action concerns the solicitation and sale of immigration bonds.[8] As explained in the

6  complaint, the United States Department of Homeland Security (the "DHS") often requires the

7  posting of an immigration bond before it will release an alien from detention pending final

8  determination, adjustment, or adjudication of the alien's immigration status.[9] An alien, or family

9  member or friend, can obtain an immigration bond by contacting either an approved surety or an

10  agent that has been appointed to solicit, sell, or otherwise transact business on behalf of the

11  surety.[10] The applicant must pay an insurance premium, and often has to deposit collateral in the

12  form of cash, credit card authorization, or real property.[11] By posting an immigration bond, the

13  surety agrees to pay a liquidated damages penalty if the DHS makes a lawful demand to produce

14  the bonded alien, and the alien fails to appear for proceedings such as interviews, court hearings,

15  or removal.[12]

16  The DHS accepts corporate immigration security bonds, in lieu of cash bonds, but only

17  from sureties that are authorized to post federal bonds by the United States Department of the

18  Treasury ("USDT"), and have been so recognized in Treasury Circular 570.[13] Plaintiffs allege

19  that Fidelity National and Lexington are listed in Treasury Circular 570, and are therefore eligible

20  _____

21  [7]*Id.*, ¶ 10.

22  [8]*Id.*, ¶ 14.

23  [9]*Id.*

24

25  [10]*Id.*, ¶ 16.

26  [11]*Id.*

27  [12]*Id.*

28  [13]*Id.*, ¶ 15.

3

1  to post federal bonds.[14]

2      The issuance of immigration bonds is governed by the DHS's administrative rules.  The

3  bonds are also a type of insurance that is subject to regulation by the states.[15]  The California

4  Department of Insurance (the "DOI") has determined that before an insurance company can issue

5  immigration bonds, it must obtain authorization to write commercial surety coverage in the form

6  of a valid California Certificate of Authority.[16]  To secure a Certificate of Authority, a company

7  must meet certain standards regarding capital reserves, accounting, and other aspects of the surety

8  business.[17]    Agents seeking to sell immigration bonds must also satisfy DOI licensing

9  requirements.[18]  Specifically, they must obtain a valid Fire and Casualty ("F&C") insurance

10  license issued by the state; an agent who is only licensed to solicit, issue, or sell bail bonds (i.e.,

11  a bail bond licensee) is not authorized to solicit, issue, or sell immigration bonds.[19]

12      **C.    Allegations Relating To Defendants' Solicitation, Sale, And Issuance Of**

13           **Immigration Bonds**

14      Plaintiffs assert that each of the defendants has engaged in the unauthorized and unlawful

15  solicitation, sale, and issuance of immigration bonds in the State of California.[20]  They allege that

16  at the relevant times, Fidelity National held a California Certificate of Authority to write certain

17  lines of insurance, but did not have the requisite certificate to write commercial surety insurance,

18  including immigration bonds.[21]  They assert that Fidelity National violated California Insurance

19  _____

20      [14]*Id.*

21      [15]*Id.*, ¶ 17.

22      [16]*Id.*, ¶ 18.

23      [17]*Id.*

24      [18]*Id.*, ¶ 19.

25      [19]*Id.*

26      [20]*Id.*, ¶ 14.

27      [21]*Id.*, ¶ 20.

28

                                    4

1  Code § 700 by soliciting, selling, and issuing immigration bonds with knowledge that its

2  Certificate of Authority was deficient,[22] and allege that Fidelity National engaged in other

3  unlawful insurance practices as well, specifically: (1) failing to make a rate filing with, and/or

4  obtain rate approval from, the DOI with respect to its immigration bond business in violation of

5  Insurance Code § 1861.01(c); (2) failing properly to appoint agents to transact immigration bond

6  insurance business in California as mandated by Insurance Code § 1704; and (3) failing to ensure

7  that its California agents had valid a F&C license as required by Insurance Code § 1631.[23]

8  Plaintiffs allege on information and belief that Fidelity National is no longer issuing new

9  immigration bonds, but that it continues to collect renewal premiums and administer open

10  immigration bonds.[24]

       11  Plaintiffs allege that Lexington charges premiums for immigration bonds in excess of its

12  approved rate filing in breach of Insurance Code § 1861.05,[25] and that, like Fidelity National, it

13  has violated Insurance Code §§ 1704 and 1631.[26]

       14  Plaintiffs allege, on information and belief, that Bankers Surety is the managing general

15  agent of Fidelity National and Lexington, and in that capacity, sets all policies and makes all

16  decisions regarding those companies' solicitation, sale, and issuance of immigration bonds.[27]

17  Plaintiffs assert that Bankers Surety is not an insurer authorized to write insurance, nor a licensed

18  insurance agent or non-resident producer.[28]  As a result, they contend that Bankers Surety

19

20

---

21  [22]*Id.*

22  [23]*Id.*

23  [24]*Id.*

24  [25]*Id.*, ¶ 21.

25

26  [26]*Id.*

27  [27]*Id.*, ¶ 22.

28  [28]*Id.*

1   unlawfully transacts insurance business in California.[29]

2       Action Bail, Action Immigration, Robert Prager, and Judy Prager (collectively, the

3   "Action Defendants") purportedly serve as Lexington's agents, and post immigration bonds on

4   behalf of Lexington in California.[30]  Plaintiffs assert that the Action Defendants have violated the

5   Insurance Code for many years by transacting bail bond insurance business in California without

6   the proper license and authorization.[31]  They contend that the Action Defendants have solicited

7   the sale of immigration bonds in California by offering bail bondsmen commissions for referring

8   customers.[32]  The Action Defendants have purportedly made such offers via direct mail

9   advertisements and their internet site, notwithstanding knowledge that the vast majority of bail

10  bondsmen maintain only a bail bond license, and are not authorized to serve as immigration bond

11  agents.[33]  Plaintiffs contend that the Action Defendants have improperly licensed bail bondsmen

12  to solicit and sell immigration bonds, and have also failed to appoint and supervise the agents

13  properly in contravention of the Insurance Code.[34]

14      Defendant Stevens is a California bail bondsman.[35]  Plaintiffs allege that Stevens holds a

15  valid bail bond license, but not a valid California F&C license.[36]  They assert that at the relevant

16  times, Stevens unlawfully solicited and/or sold immigration bonds in California through his bail

17  bond agency and through his websites.[37]  Stevens purportedly conducted this business on behalf

18  _____

19     [29]*Id.*

20     [30]*Id.*, ¶ 21.

21     [31]*Id.*, ¶ 23.

22     [32]*Id.*, ¶ 24.

23     [33]*Id.*

24     [34]*Id.*

25     [35]*Id.*, ¶ 25.

26     [36]*Id.*

27     [37]*Id.*

28

1    of Action Immigration and Action Bail, and received commissions in return.[38]

2    Plaintiff allege that all defendants utilized a "referral system" to circumvent the provisions

3    of the California Insurance Code and the DOI's regulatory scheme.[39]  Specifically, they contend

4    that Fidelity National and Lexington allowed Bankers Surety to manage their immigration bond

5    program,[40] that all three companies use the Action Defendants to solicit and sell immigration

6    bonds to California residents,[41] and that the Action Defendants in turn use California bail

7    bondsmen like Stevens in the solicitation and sales effort.[42]

8    **D.    Allegations Pertaining To The Orellana Transaction**

9    Lidia Orellana alleges that in 2003, defendants successfully solicited her to purchase an

10   immigration bond.[43]  Orellana asserts that defendants required that she execute an indemnity

11   agreement, promissory note, and deed of trust pledging her California real property as collateral.[44]

12   Orellana contends she was unaware that (1) Fidelity National did not have a Certificate of

13   Authority from the DOI to write surety business in California; (2) Fidelity National did not have

14   an approved rate filing with the DOI for immigration bond transactions; (3) the premium she was

15   charged exceeded the legally permissible rate; (4) the Action Defendants were not licensed by the

16   DOI to transact insurance business in California or authorized by the Secretary of State to conduct

17   any business in the state.[45]

18   Purportedly because of defendants' failure to satisfy statutory and regulatory requirements,

19   _____

20   [38]*Id.*

21   [39]*Id.*, ¶ 26.

22   [40]*Id.*

23   [41]*Id.*

24   [42]*Id.*

25   [43]*Id.*, ¶ 27.

26   [44]*Id.*

27   [45]*Id.*, ¶ 28.

28

1 | Orellana was required to pay premiums in excess of the rate allowed by law, in addition to the

2 | full amount of the immigration bond ($10,000.00).[46]  Orellana contends that she "was subjected

3 | to substantial damage due to the harm to her credit rating as Defendants commenced foreclosure

4 | proceedings against her home, all in violation of federal, state and case law."[47]

5 |

6 | ## II. PROCEDURAL BACKGROUND

7 | ### A.   Filing Of Original Complaint

8 | G&G initiated this action in state court on July 20, 2005, suing both individually and on

9 | behalf of the general public.[48]  The complaint named the following entities and individuals as

10 | defendants: Action Immigration, Action Bail, Robert Prager, Judy Prager, Fidelity National,

11 | Bankers Surety, and Kassabian Haroutiun Simone, d/b/a People's Bail Bond Agency

12 | ("Simone").[49]  G&G asserted a single claim for violation of the Unfair Competition Law

13 | ("UCL"), California Business & Professions Code §§ 17200 et seq.[50]  Based on allegations

14 | substantially similar to those set forth above, it sought, both "on behalf of itself and all others

15 | similarly situated, . . . a preliminary and permanent injunction pursuant to *Business & Professions*

16 | *Code*, § 17203, enjoining defendants, and each of them, from continuing to engage in the

17 | unlawful, unfair and fraudulent conduct alleged herein."[51] · G&G also sought, for itself and all

18 | others similarly situated, "an order of restitution pursuant to *Business & Professions Code*,

19 |

---

20 |

21 | [46]*Id.*, ¶ 29.

22 |

23 | [47]*Id.*

24 | [48]See Action International Insurance, Inc., Action Bail Bonds, Inc., Robert Prager, Judy Prager, Fidelity National Property & Casualty Insurance Co., Bankers Surety Services, Inc., and Lexington National Insurance Company's Notice of Removal Under 28 USC § 1441(b) (Federal Question & Diversity) ("Defs.' Notice of Removal"), Exh. 2 (Complaint).

25 |

26 | [49]*Id.*

27 | [50]*Id.*, Exh. 2 (Complaint, ¶¶ 24-29).

28 | [51]*Id.*, Exh. 2 (Complaint, ¶ 27).

8

1   § 17203, requiring Defendants to disgorge any and all monies, premiums, renewal premiums,

2   administrative expenses, cash collateral, real property, and the like, which [have] been collected

3   by Defendants as a result of [their] unlawful, unfair, and fraudulent business practices[ ] described

4   herein."[52]

5       The Action Defendants, Fidelity National, and Bankers Surety answered plaintiff's

6   complaint on September 15, 2005.[53] They raised twenty-nine affirmative defenses, one of which

7   was federal preemption.[54]

8       **B.      Filing Of First Amended Complaint**

9       On November 16, 2005, G&G and Lidia Orellana filed a first amended complaint for

10  themselves and the general public.[55] The first amended complaint made three revisions to the

11  original pleading.  First, it named Stevens as a defendant.[56]  Second, G&G asserted additional

12  claims for intentional and negligent interference with prospective economic advantage.[57] Third,

13  respects the UCL claim, plaintiffs made new allegations regarding a putative class of Bond

14  Purchasers.[58]

15

16

17

        [52]*Id.*, Exh. 2 (Complaint, ¶ 29).

18

19      [53]See *id.*, Exh. 3 (Defendants Action International Insurance, Inc., d/b/a Action
    Immigration Bonding, Action Bail Bonds, Inc., Robert Prager, Judy Prager, Fidelity National
20  Property & Casualty Insurance Co., and Bankers Surety Services, Inc.'s Answer to Plaintiff's
    Complaint ("Defs.' Answer to Complaint")).

21

22      [54]See *id.*, Exh. 3 (Defs.' Answer to Complaint, ¶ 25 ("The claims and contentions of
    Plaintiff as contained in the Complaint are barred by the doctrine of federal preemption with
23  respect to immigration bond matters.  This defense is alleged in the alternative and does not admit
    any allegations contained in the Complaint)).

24

25      [55]*Id.*, Exh. 4 (First Amended Complaint).

26      [56]See *id.*  Plaintiffs dismissed Simone on November 21, 2005.  (See *id.*, ¶ 4.)

27      [57]See *id.*, Exh. 4 (First Amended Complaint).

28      [58]*Id.*, Exh. 4 (First Amended Complaint, ¶¶ 30-39).

                                            9

1    Stevens answered the first amended complaint on December 24, 2005,[59] asserting sixteen

2    affirmative defenses, including federal preemption.[60]

3    **B.    Demurrer And Motion To Strike First Amended Complaint**

4         On December 12, 2005, the Action Defendants, Fidelity National, and Bankers Surety filed

5    a demurrer to plaintiffs' first amended complaint.[61]  Defendants asserted (1) that plaintiffs' UCL

6    claim was barred as a matter of law because it was federally preempted;[62] (2) that G&G lacked

7    standing to bring the UCL claim because it did not have a well-defined community of interest with

8    the alleged class of Bond Purchasers;[63] (3) that the UCL claim failed as a matter of law because

9    plaintiffs had not specifically alleged an underlying violation of law or statute;[64] (4) that the first

10   amended complaint was defective because plaintiffs had failed to allege affirmatively the

11   exhaustion of available administrative remedies;[65] and (5) that G&G failed to state a claim for

12   intentional or negligent interference with prospective economic advantage.[66]

13        Simultaneously, the Action Defendants, Fidelity National, and Bankers Surety filed a

14   motion to strike defendants sought to strike (1) G&G's designation as a class representative;

15   (2) G&G's prayer for attorneys', consultants', and experts' fees; and (3) plaintiffs' prayer for

16   _____

17        [59]See *id.*, Exh. 5 (Stevens' Answer to First Amended Complaint).

18        [60]See *id.*, Exh. 5 (Stevens' Answer to First Amended Complaint, ¶ 16 ("Immigration
     bonds are governed by Federal law which cont[r]ols the posting of such bonds, and therefore this
19   matter cannot be brought in a State court")).

20        [61]*Id.*, Exh. 6 (Action International Insurance, Inc. d/b/a Action Immigration Bonding,
21   Action Bail Bonds, Inc., Robert Prager, Judy Prager, Fidelity National Property & Casualty
     Insurance Co., Bankers Surety Services, Inc.'s Notice of Demurrer and Demurrer to Plaintiffs'
22   First Amended Complaint ("Defs.' Demurrer")).

23        [62]See *id.*, Exh. 6 (Defs.' Demurrer at 3-5).
24
          [63]See *id.*, Exh. 6 (Defs.' Demurrer at 5-6).
25
26        [64]See *id.*, Exh. 6 (Defs.' Demurrer at 7-10).

27        [65]See *id.*, Exh. 6 (Defs.' Demurrer at 10-12).

28        [66]See *id.*, Exh. 6 (Defs.' Demurrer at 13-15).

1     exemplary and punitive damages.[67]

2         On January 27, 2006, the state court sustained the demurrer with leave to amend.[68] As

3     respects the UCL claim, the court found that plaintiffs had failed adequately to allege unfair or

4     fraudulent conduct as required by California Business & Professions Code §§ 17200 et seq. It

5     also found that plaintiffs had failed to state claims for intentional and negligent interference with

6     prospective economic advantage claims.[69]

7         The state court granted in part and denied in part defendants' motion to strike. It struck

8     G&G's prayer for consultants' and experts' fees, but declined to strike G&G's designation as a

9     class representative. The court denied all other aspects of the motion as moot.[70]

10     **C.**     **Filing Of Second Amended Complaint**

11         Plaintiffs filed their second amended complaint on February 15, 2006.[71] The second

12     amended complaint adds Lexington as a defendant,[72] and includes new allegations in the UCL

13     claim that specify the statutes, regulations, and legal standards defendants' practices allegedly

14     violated.[73] The pleading also defines two putative classes – a class of Bond Purchasers, similarly

---

18      [67]*Id.*, Exh. 7 (Notice of Motion and Motion to Strike Plaintiff Gonzales & Gonzales Bonds

19     and Insurance Agency, Inc.'s Designation as a Class Representative, Prayer for Relief for

20     Attorneys', Consultants' and Experts' Fees Incurred by Gonzales & Gonzales Bonds and

      Insurance Agency, Inc. in Connection with This Action, and Prayer for Exemplary and Punitive

21     Damages from the First Amended Complaint of Plaintiff's Gonzales & Gonzales Bonds and

      Insurance Agency, Inc., and Lidia Orellana).

22

23      [68]*Id.*, Exh. 12 (State Court Order).

24      [69]*Id.*

25      [70]*Id.*

26      [71]*Id.*, ¶ 8, Exh. 1 (Summons and Second Amended Complaint).

27      [72]See *id.*, Exh. 1 (Second Amended Complaint, ¶ 9).

28      [73]See *id.*, Exh. 1 (Second Amended Complaint, ¶ 31).

1  situated to Orellana, and a class of Bond Sellers, similarly situated to G&G.[74]  The second

2  amended complaint also makes modifies the allegations supporting G&G's claims for intentional

3  and negligent interference with prospective economic advantage.[75]

4          Plaintiffs served the second amended complaint on all defendants except Lexington

5  (collectively, the "FAC Defendants") on February 15, 2006.[76]  They served the second amended

6  complaint and summons on Lexington on February 28, 2006.[77]

7          **D.    Removal Of Action To Federal Court**

8          Defendants filed a notice of removal on March 17, 2006, asserting that the court had

9  jurisdiction to hear the claims in the second amended complaint because it is a purported class

10  action that falls within the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2)[78] and

11  because it falls within the court's federal question jurisdiction,[79] i.e., that plaintiffs' allegation that

12  federal immigration bonds are subject to state regulation raises a "federal question . . . as to

13  whether . . . California may regulate the licensing and issuance of federal immigration bonds both

14  within and outside the state, notwithstanding the federal government's right to regulate

15  ————————————————

16          [74]See *id.*, Exh. 1 (Second Amended Complaint, ¶ 32 ("The definition of the class of

17  individuals that are similarly situated with respect to Orellana, based upon information and belief
    at the time of this First Amended Complaint, is as follows: all persons residing within the State

18  of California who have, within the last four years, conducted business with Defendants arising
    out of the solicitation, sale and/or issuance of immigration bonds by Defendants.  The above-

19  referenced class is hereinafter referred to as the 'Bond Purchasers'"), ¶ 33 ("The definition of the

20  class of individuals that are similarly situated with respect to G&G, based upon information and
    belief at the time of this First Amended Complaint, is as follows: all persons or entities who have,

21  within the last four years, solicited, sold and/or issued immigration bonds within California with
    the proper California State licensure.  The above-referenced class is hereinafter referred to as the

22  'Bond Sellers'")).

23          [75]See *id.*, Exh. 1 (Second Amended Complaint, ¶¶ 49, 55).

24
        [76]*Id.*, ¶ 8.
25
        [77]*Id.*, ¶ 9.
26
        [78]See *id.*, ¶ 11.
27
        [79]*Id.*, ¶ 17.
28

1  immigration."[80]   The notice alleges that the removal was timely because it was "filed within

2  thirty days after receipt of the summons and the [second amended complaint] by the FAC

3  Defendants and Lexington . . . ."[81]

4

5                                    **III.  DISCUSSION**

6  **A.     Legal Standard Governing Removal Jurisdiction**

7         A suit filed in state court may be removed to federal court if the federal court would have

8  had original subject matter jurisdiction to hear the action.   28 U.S.C. § 1441(a) ("Except as

9  otherwise expressly provided by Act of Congress, any civil action brought in a State court of

10  which the district courts of the United States have original jurisdiction, may be removed by the

11  defendant or the defendants, to the district court of the United States for the district and division

12  embracing the place where such action is pending"); *Caterpillar, Inc. v. Williams*, 482 U.S. 386,

13  392 (1987); *Snow v. Ford Motor Co.*, 561 F.2d 787, 789 (9th Cir. 1977).   The Ninth Circuit

14  "strictly construe[s] the removal statute against removal jurisdiction."   *Gaus v. Miles, Inc.*, 980

15  F.2d 564, 566 (9th Cir. 1992) (citing *Boggs v. Lewis*, 863 F.2d 662, 663 (9th Cir. 1988), and

16  *Takeda v. Northwestern Nat'l. Life Ins. Co.*, 765 F.2d 815, 818 (9th Cir. 1985)).   Thus, all

17  doubts as to the removability of an action are resolved in favor of remand.   *Id.* at 566-67

18  ("Federal jurisdiction must be rejected if there is any doubt as to the right of removal in the first

19  instance," citing *Libhart v. Santa Monica Dairy Co.*, 592 F.2d 1062, 1064 (9th Cir. 1979)).

20         The proper procedural vehicle for challenging the removal to federal court of a state court

21  action is a motion to remand.   See 28 U.S.C. § 1447(c); *Ultra Tool & Plastics, Inc. v. Schulman*,

22  No. 98-CV-0473E(SC), 1998 WL 864896, *1 (W.D.N.Y. Dec. 2, 1998).   Once a remand motion

23  is filed, the party that removed the case bears the burden of establishing that federal jurisdiction

24  is proper.   See *Gaus*, 980 F.2d at 566-67 ("The 'strong presumption' against removal jurisdiction

25  means that the defendant always has the burden of establishing that removal is proper," citing

26  ───────────────

27         [80]*Id.*

28         [81]*Id.*, ¶ 10.

                                              13

1   *Nishimoto v. Federman-Bachrach & Assocs.*, 903 F.2d 709, 712 n. 3 (9th Cir. 1990), and *Emrich*

2   *v. Touche Ross & Co.*, 846 F.2d 1190, 1195 (9th Cir. 1988)); *Emrich*, 846 F.2d at 1195 (citing

3   *Wilson v. Republic Iron & Steel Co.*, 257 U.S. 92, 97 (1921)).  This is true even where CAFA

4   provides the basis for removal.  *Abrego Abrego v. The Dow Chemical Co.*, 443 F.3d 676, 685

5   (9th Cir. 2006) ("under CAFA the burden of establishing removal jurisdiction remains, as before,

6   on the proponent of federal jurisdiction").

7           Where the facts supporting federal jurisdiction are not alleged in the complaint, the

8   defendant must show by a preponderance of the evidence that federal jurisdiction exists.  See

9   *Matheson v. Progressive Specialty Ins. Co.*, 319 F.3d 1089, 1091 (9th Cir. 2003); see also

10  *Sanchez v. Monumental Life Ins. Co.*, 102 F.3d 398, 404 (9th Cir. 1996) ("Under [the

11  preponderance of the evidence] burden, the defendant must provided evidence establishing that

12  it is 'more likely than not' [that jurisdiction is satisfied]").

13      **B.      Legal Standard Governing Timeliness Of Removal**

14          The right to remove a case from state to federal court is entirely a creature of statute.

15  *Libhart*, 592 F.2d at 1064.   Removing defendants must comply with certain procedural

16  requirements.  Among these is a requirement that a notice of removal be filed within thirty days

17  after service of the summons and complaint.  28 U.S.C. § 1446(b); see *Murphy Brothers, Inc.*

18  *v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 354 (1999).  The statute provides for a renewed

19  thirty-day removal period if the original complaint is not removable.  This period commences on

20  the defendant's receipt of "an amended pleading, motion, order or other paper from which it may

21  first be ascertained that the case is one which is or has become removable. . . ."  28 U.S.C.

22  § 1446(b); see *Harris v. Bankers Life and Casualty Co.*, 425 F.3d 689, 692 (9th Cir. 2005) ("The

23  statute provides two thirty-day windows during which a case may be removed – during the first

24  thirty days after the defendant receives the initial pleading or during the first thirty days after the

25  defendant receives a paper 'from which it may first be ascertained that the case is one which is

26  or has become removable' if 'the case stated by the initial pleading is not removable,'" citing 28

27  U.S.C. § 1446(b)); see also *id.* at 694 ("[E]ven if a case were not removable from the outset, it

28  is rendered removable by virtue of a change in the parties or other circumstances revealed in a

1    newly-filed 'paper' then the second thirty-day window is in play"). No case may be removed on

2    the basis of diversity jurisdiction "more than 1 year after commencement of the action." 28

3    U.S.C. § 1446(b).

4          **C.    Whether Defendants' Removal Was Timely**

5          Plaintiffs argue that remand is required because even if defendants could show that the

6    court has subject matter jurisdiction, they failed to file their notice of removal within the thirty-

7    day window provided in 28 U.S.C. § 1446(b).[82] Plaintiffs assert that the first amended complaint

8    gave defendants adequate notice of the grounds on which they later removed the case.[83] Although

9    they acknowledge that Lexington was not added as a defendant until the second amended

10   complaint and was not served until February 28, 2006, plaintiffs maintain that under the "first-

11   served rule," the thirty-day removal period began to run when the first amended complaint was

12   served on the FAC Defendants on November 16, 2005.[84] Because defendants did not file their

13   notice of removal until March 17, 2006, plaintiffs argue that the removal was procedurally

14   improper and the case must be remanded.

15         Defendants counter that the removal was timely under 28 U.S.C. § 1446(b) because it was

16   the second amended complaint, rather than the first amended complaint, that gave rise to federal

17   jurisdiction.[85] As a result, they assert, the thirty-day period did not begin to run until February

18   15, 2006, and they satisfied the timeliness requirement. Alternatively, defendants contend that,

19

---

20         [82]See Notice of Motion and Motion to Remand of Plaintiffs Gonzales & Gonzales Bonds

21   and Insurance Agency, Inc. and Lidia Orellana ("Pls.' Mot.") at 9. Plaintiffs' procedural

22   challenge is timely under 28 U.S.C. § 1447(c). See 28 U.S.C. § 1447(c) ("A motion to remand
     the case on the basis of any defect other than lack of subject matter jurisdiction must be made

23   within 30 days after the filing of the notice of removal under section 1446(a)"); see also *Ritchey*
     *v. Upjohn Drug Co.*, 139 F.3d 1313, 1315 (9th Cir. 1998); *Northern California Dist. Council of*

24   *Laborers v. Pittsburg-Des Moines Steel Co.*, 69 F.3d 1034, 1038 (9th Cir. 1995).

25         [83]See *id.*

26         [84]See *id.* at 10.

27
           [85]Opposition to Motion to Remand of Plaintiffs Gonzales & Gonzales Bonds and Insurance
28   Agency, Inc. and Lidia Orellana ("Defs.' Opp.") at 18.

1  if the court concludes the first amended complaint provided sufficient notice of the action's

2  removability, it should apply the "last-served" rule, since it would be unfair to deprive Lexington

3  of the right to remove simply because other defendants elected not to seek removal earlier.[86]

4  Because Lexington was not served until February 28, 2006, defendants assert that removal on

5  March 16, 2006 was timely.

6           1.      **Which Complaint Gave Defendants Notice That The Case Was**

7                   **Removable**

8  Section 1446(b) reads:

9       "The notice of removal of a civil action or proceeding shall be filed within thirty

10      days after the receipt by the defendant, through service or otherwise, of a copy of

11      the initial pleading setting forth the claim for relief upon which such action or

12      proceeding is based, or within thirty days after the service of summons upon the

13      defendant if such initial pleading has then been filed in court and is not required to

14      be served on the defendant, whichever period is shorter."  28 U.S.C. § 1446(b).

15  Under this statute, once "a defendant learns that an action is removable, he has thirty days to

16  remove the case to federal court." *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1250 (9th

17  Cir. 2006).  "Otherwise, the thirty-day clock doesn't begin ticking until a defendant receives 'a

18  copy of an amended pleading, motion, order or other paper' from which it can determine that the

19  case is removable."  *Id.* at 1250 (citing 28 U.S.C. § 1446(b)).

20      In their notice of removal, defendants assert that the court has subject matter jurisdiction

21  because plaintiffs' claim raise a federal question and because there is diversity jurisdiction under

22  CAFA.[87]  Plaintiffs contend that the first amended complaint contained all of the "underlying

23  allegations that Defendants contend support . . . removal," and that the "only relevant changes

24  made by plaintiffs between the [first and second amended complaints] were the inclusion of

25

---

26      [86]See *id.* at 19-20.

27      [87]Defs.' Notice of Removal, ¶¶ 11, 17.  See also Defs.' Opp. at 5-17 (arguing that this

28  court has federal jurisdiction under both the CAFA and federal question provisions).

1   specific violations of California statutes, as well as the regulatory and case authority supporting

2   Plaintiffs' claim for violation of California Business and Professions Code § 17200, et seq.[88]

3   Consequently, plaintiffs argue, service of the first amended complaint triggered the thirty-day time

4   period for removal.

5         Defendants counter that because the first amended complaint was "on its face [s]o defective

6   as to sustain demurrer in state court," it did not provide sufficient notice that the action was

7   removable.[89]  Defendants contend that plaintiffs' "inclusion of 'specific violations of California

8   statutes' as well as 'regulatory and case authority' supporting Plaintiffs' claims for violations of

9   the UC[L] were critical and necessary elements" for them to ascertain that the case had become

10   removable under the federal question statute.[90]  They assert that the changes were also necessary

11   to their determination that the action was removable under CAFA.   Specifically, defendants

12   contend that because the first amended complaint "attempted to improperly blend a class of Bond

13   Purchasers and Bond Sellers together to form a single class," they could not determine whether

14   the case was a class or mass action having more than one hundred members with an amount in

15   controversy exceeding $5 million.[91]

16         Although not cited in defendants' papers, it appears that their arguments are based on the

17   Ninth Circuit's recent decision in *Harris*, 425 F.3d 689.  There, the Ninth Circuit held that "the

18   'thirty day time period [for removal] . . . starts to run from defendant's receipt of the initial

19   pleading only when that pleading affirmatively reveals on its face' the facts necessary for federal

20   court jurisdiction." *Id.* at 690-91 (quoting *Chapman v. Powermatic, Inc.*, 969 F.2d 160, 163 (5th

21   Cir. 1992) (alterations original), and citing *Lovern v. General Motors Corp.*, 121 F.3d 160, 162

22   (4th Cir. 1997)).  Robert Harris was the beneficiary of a disability and life insurance policy issued

---

[88]Pls.' Mot. at 9.

[89]Defs.' Opp. at 18.

[90]*Id.* at 18-19.

[91]See *id.* at 19.

by Bankers Life & Casualty Co. ("Bankers") in 1972. *Id.* at 691. After suffering a heart attack, Harris made a claim for disability benefits. *Id.* Bankers made only two payments and then denied Harris' claim, asserting that he was only partially disabled by the heart attack. *Id.* In January 2003, Harris sued Bankers in Montana state court, asserting contract and state statutory claims. *Id.* Harris also sued Kenneth Brown, the insurance agent who had sold him the policy, for misrepresentation and fraud. *Id.* The original complaint, served on Bankers on January 28, 2003, alleged that Harris was a Montana resident, and that Bankers was an Illinois corporation, licensed to sell insurance policies in Montana. *Id.* It also alleged that as of 1972, Brown "resided . . . in Montana, and was a 'Licensed Resident Agent' in . . . . Montana for BANKERS." *Id.* Neither the original complaint nor subsequent amended complaints alleged Brown's state of citizenship. *Id.*

During the course of discovery, Bankers produced documents showing that Brown had been terminated from his employment in 1973, and that he was living in Kentucky at the time. *Id.* In response to an interrogatory requesting last-known contact information for sales agents that had sold disability or income protection policies in Montana since 1972, Bankers stated that it was attempting to determine whether such information could be obtained for agents who had worked thirty years earlier. *Id.* In October 2003, with trial just five months away, Bankers moved to continue the trial date, citing, among other things, the fact that Brown had not yet been served or dismissed from the case. *Id.* On October 21, 2003, Harris's counsel wrote Bankers in which he opposed the request for a continuance. *Id.* Bankers interpreted this to mean that Harris had abandoned his claims against Brown, and asked the attorney to confirm whether Harris planned to pursue service on Brown. *Id.* When it received no response, Bankers filed a notice of removal on November 3, 2003. *Id.* at 692-93. It argued that complete diversity was not evident on the face of the complaint or amended complaints, and that it was only when it received the October 21, 2003 letter that it been able to determine removability with any certainty. *Id.* at 693. As a result, Bankers argued, the thirty-day clock had begun to run anew on October 21, 2003. *Id.*

Harris moved to remand. *Id.* A few days later, Harris's counsel filed an affidavit stating that he had cross-referenced Brown's personal information – which Bankers had produced in

18

1   discovery – with a Social Security Death Index on the Internet, and had discovered that Brown

2   had died in 1983. *Id.* The district court denied the motion to remand, holding that Harris had

3   effectively abandoned his claims against Brown, or alternatively, that naming a defendant who

4   had been dead for nearly twenty years was equivalent to fraudulent joinder. *Id.*

5          The Ninth Circuit held that the first thirty-day clock under § 1446(b) does not start running

6   unless "the ground for removal . . . [is] revealed affirmatively in the initial pleading." *Id.* at 695;

7   *see id.* at 695 n. 5 (citing cases from the Second, Third, Fifth, Eighth, and Tenth Circuits that

8   have adopted this approach). Stated differently, the court said, removability must be "determined

9   through examination of the four corners of the applicable pleadings, not through subjective

10  knowledge or a duty to make further inquiry." *Id.* at 694. The court reasoned that if defendants

11  were required to remove within thirty days of receiving an indeterminate pleading, based on a

12  "clue" that the case might be removable or based on their ability to ascertain jurisdictional facts

13  through reasonable investigation, "defendants [might] be encouraged to engage in premature

14  removals in order to ensure that they [did] not waive their right to removal." *Id.* at 697.

15         By contrast, it stated, a bright-line rule that confined analysis of removability to the

16  allegations in plaintiffs' pleading would "bring[ ] certainty and predictability to the process and

17  avoid[ ] gamesmanship in pleading." It would also, the court noted, "avoid[ ] the spectre of

18  inevitable collateral litigation over whether the pleadings contained a sufficient 'clue,' whether

19  defendant had subjective knowledge, or whether defendant conducted sufficient inquiry." *Id.*

20  (footnote omitted); *see also id.* (noting, "in the context of removal based on diversity," that

21  § 1446(b) prevents "unreasonable waste of judicial resources by limiting the extended period of

22  removal to one year after 'commencement of the action" which "gives the defendants sufficient

23  incentive and time to determine the facts to justify removal without imposing an undue burden to

24  investigate removal within the first thirty days of receiving an indeterminate complaint" (citation

25  omitted)).

26         Applying this rule, the Ninth Circuit held that Bankers had timely removed the case,

27  because the face of the "initial pleading did not affirmatively reveal information to trigger removal

28  based on diversity jurisdiction because the initial pleading only stated Brown's 1972 residency,

19

1  not his citizenship, and certainly not his citizenship as of the filing of the complaint." *Id.* at 695.

2  The court agreed that the case became removable on "October 21, 2003, when it became apparent

3  that Harris had abandoned his claims against Brown," and "the complete diversity between the

4  remaining parties first became ascertainable." *Id.* at 696 (citation omitted).  Although it may have

5  been relatively easy for Bankers to ascertain the relevant jurisdictional facts within the first thirty

6  days of the case – i.e., by cross-referencing Brown's employee data with the Social Security

7  Death Index – the *Harris* court concluded that under the bright-line rule, it was not obligated to

8  conduct *any* extrinsic investigation.  *Id.*

9          It is helpful to contrast *Harris* with the Ninth Circuit's earlier decision in *Cantrell v. Great*

10  *Republic Insurance Company*, 873 F.2d 1249 (9th Cir. 1989).  There, the insured filed a state

11  court action against Great Republic Insurance Company ("GRIC") on October 8, 1985, alleging

12  breach of the covenant of good faith and fair dealing and wrongful rescission of a health insurance

13  policy.  *Id.* at 1249-50.  The Great Republic Life Insurance Company ("GRLIC") answered the

14  complaint in January 1986.  *Id.* at 1250.  More than a year and a half later, on September 18,

15  1987, Cantrell's attorney mailed a copy of a proposed first amended complaint to counsel for

16  GRIC and GRLIC.  *Id.* at 1251.  The amended pleading proposed to add plaintiff Cantrell in her

17  capacity as the administrator of her daughter's estate, and to add GRLIC as a defendant.  *Id.*

18  After defense counsel refused to stipulate, Cantrell sought leave to amend, which was granted on

19  October 21, 1987.  *Id.*

20          On November 20, 1987, two years after commencement of the case, GRIC and GRLIC

21  jointly removed the action to federal court, asserting that there was federal question jurisdiction

22  under ERISA.  *Id.*  Defendants argued that the removal was timely because the first amended

23  complaint had added new parties.  *Id.*  Cantrell moved to remand, asserting that the action did not

24  "arise under" federal law, as "neither the original nor the amended complaint provided any

25  indication that [she] . . . asserted a claim created by federal law."  *Id.*  Cantrell argued

26  alternatively that the removal was untimely.  See *id.* at 1253-54.  The district court refused to

27  remand, and the action was eventually dismissed on the merits.  *Id.* at 1251.

28          The Ninth Circuit affirmed the district court's determination that plaintiff's state law

1   claims, though "artfully pleaded," were completely preempted by ERISA; because the action

2   "arose under" federal law, it was removable to federal court. *Id.* at 1251-53 (citations omitted).

3   It nonetheless reversed the district court's denial of the remand motion, holding that while the case

4   had been removable, defendants had failed to remove within the period prescribed by 28 U.S.C.

5   § 1446(b). See *id.* at 1254-56. The court concluded that the thirty-day clock began to run with

6   service of the original complaint on GRIC, not with the filing of the amended complaint. This

7   was because "neither the addition of Cantrell as a plaintiff in her representative capacity nor the

8   addition of GRLIC as a defendant ma[de] the amended complaint 'an amended pleading . . . from

9   which it *first* may be ascertained that the case is one which is or has become removable.'" *Id.*

10  at 1255 (quoting 28 U.S.C. § 1446(b) (emphasis original)); see *id.* ("There is nothing about the

11  addition of a party plaintiff or defendant in the context of this action that either creates federal

12  jurisdiction or makes the fact of federal jurisdiction newly ascertainable").

13         Under these circumstances, the court noted, it was unfair "to let appellees 'have it both

14  ways,' i.e., to permit them to remove the action on the basis of ERISA preemption but excuse

15  them from compliance with the thirty-day removal period, at least in the absence of evidence that

16  appellees were ignorant of the presence of an ERISA component in the action prior to the filing

17  of the amended complaint." *Id.*; see also *id.* at 1255 n. 11 (noting that appellees did not require

18  discovery to reveal the true nature of plaintiff's claims).

19         This case is more analogous to *Cantrell* than to *Harris*. Defendants assert that neither the

20  original nor first amended complaints gave them sufficient notice of the existence of a federal

21  question. They contend that the changes incorporated into the second amended complaint –

22  specifically, the "inclusion of 'specific violations of California statutes' as well as 'regulatory and

23  case authority' supporting Plaintiffs' claims for violations of the UC[L]" – were necessary for

24  them to make this determination.[92] This argument is unpersuasive. Defendants' notice of removal

25  alleged that "a federal question arises" from the second amended complaint "as to whether . . .

26  California may regulate the licensing and issuing of federal immigration bonds both within and

27

28         [92]Defs.' Opp. at 18-19.

                                                    21

1  outside of the state, notwithstanding the federal government's right to regulate immigration."[93]

2  Assuming, without deciding, that plaintiffs' claims "arise under" federal law because they relate

3  to the federal government's regulation of immigration bonds, defendants were on notice of this

4  ground for removal as early as the filing of the original complaint in July 2005, and at the very

5  latest when the first amended complaint was served in November 2005. A review of these earlier

6  pleadings shows, quite clearly, that G&G's UCL claim always rested on allegations that

7  defendants had engaged in unfair business practices by soliciting, issuing, and selling federal

8  immigration bonds.[94] Indeed, the original and first amended complaints included paragraphs that

9  specifically described the federal government's regulation of immigration bonds.[95] These

10 allegations made the purported existence of a federal question sufficiently clear without resort to

11 extrinsic investigation.   Compare *Harris*, 425 F.3d at 696 ("Harris admits that Brown's

12 citizenship was not revealed on the face of his initial pleading, but claims there was a clue that

13 imposed a duty to investigate further"); see *id.* at 694 (distinguishing *Cantrell* on the ground that

14 no "discovery [was] necessary to reveal the true nature of Cantrell's claims").

15

---

16  [93]Defs.' Notice of Removal, ¶ 17.

17
18  [94]See *id.*, Exh. 2 (Complaint, ¶ 12 ("The defendants in this case are engaged in the
    unauthorized and unlawful solicitation and sale of immigration bonds in the State of California")),
19  Exh. 4 (First Amended Complaint, ¶ 13 ("The Defendants in this case are engaged in the
    unauthorized and unlawful solicitation, sale and issuance of immigration bonds in the State of
20  California")).

21  [95]See *id.*, Exh. 2 (Complaint, ¶ 12 ("An immigration Bond is often required by the
22  Department of Homeland Security ('DHS') when an alien, who is allegedly unlawfully residing
    in the United States, is taken into custody pending the determination of the alien's immigration
23  status. The Immigration Bond allows the alien to be released from DHS's detention pending the
    final determination, adjustment, or adjudication of the alien's immigration status")), Exh. 4 (First
24  Amended Complaint, ¶ 13 (same)). See also *id.*, Exh. 2 (Complaint, ¶ 13 ("The DHS accepts
25  corporate immigration surety bonds as a form of security, in lieu of a cash bond, from aliens
    seeking release from detention. The DHS will only accept immigration bonds from a surety
26  company that has been approved by the Department of Treasury as a surety company authorized
27  to post federal bonds. The list of acceptable surety companies is set forth on a Department of
    Treasury publication referred to as the 'Treasury Circular 570'")), Exh. 4 (First Amended
28  Complaint, ¶ 14 (same)).

1    The fact that defendants raised federal preemption as an affirmative defense in their

2  answers to the original and first amended complaints buttresses this conclusion.[96]  Under the

3  circumstances, it would be patently unfair to let defendants "'have it both ways,' i.e., to permit

4  them to remove the action on the basis of [federal] preemption but excuse them from compliance

5  with the thirty-day removal period."  *Cantrell*, 873 F.2d at 1255 (noting that an exception to this

6  principle might exist if there was evidence that defendants "were ignorant of the presence of an

7  ERISA component in the action prior to the filing of the amended complaint").

8    Thus, even if defendants could establish the existence of federal question jurisdiction, the

9  court finds that the original and first amended complaints provided adequate notice of this basis

10  for removal, and consequently that the second amended complaint was not the pleading "from

11  which it [could] *first* [have] be[en] ascertained that the case [was] one which [was] or ha[d]

12  become removable."  28 U.S.C. § 1446(b) (emphasis added); see *Cantrell*, 873 F.2d at 1255.

13    The court reaches the same conclusion with respect to defendants' reliance on CAFA

14  diversity jurisdiction.   Defendants argue that they were unable to determine from the first

15  amended complaint whether the complaint alleged a class or mass action that fell within CAFA.

16  They assert that because plaintiffs "attempted to improperly blend a class of Bond Purchasers and

17  Bond Sellers together to form a single class" in the first amended complaint, they were unable to

18  determine whether the requirements of a class or mass action had been met – i.e., whether there

19  was a class of more than one hundred members, and an amount in controversy above $5 million.[97]

20    Defendants' notice of removal belies this assertion.  The notice cites several paragraphs

21  in the second amended complaint as evidence that the case constitutes a class action that falls

22  within CAFA.  It states:

23  ───────────────

24    [96]See *id.*, Exh. 3 (Defs.' Answer to Complaint, ¶ 25 ("The claims and contentions of
     Plaintiff as contained in the Complaint are barred by the doctrine of federal preemption with

25   respect to immigration bond matters.  This defense is alleged in the alternative and does not admit
     any allegations contained in the Complaint")), Exh. 5 (Stevens' Answer to First Amended

26   Complaint, ¶ 16 ("Immigration bonds are governed by Federal law which cont[r]ols the posting
     of such bonds, and therefore this matter cannot be brought in a State court")).

27

28    [97]See Defs.' Opp. at 19.

1    "Plaintiffs allege . . . 'for themselves and on behalf of the general public. . .,'

2    '[t]he definition of the class of individuals that are similarly situated with respect

3    to Orellana,' and '[t]he definition of the class of individuals that are similarly

4    situated with respect to G&G.' (Ex. '1,' SAC, paras. 1, 32, 33.) Plaintiffs further

5    allege that '[b]oth the Bond Purchasers and Bond Sellers are so numerous that

6    joinder of each such person[ ] and/or entity would be impracticable. . . . (Ex. '1'),

7    SAC, para. 34.  Plaintiffs also allege that '[t]here is a well defined community of

8    interests in the questions of law and fact involved affecting the Bond Purchasers and

9    Bond Sellers . . . .'  Id., para. 36.  Plaintiffs further allege that "Orellana can

10   adequately represent the Bond Purchasers' and that 'G&G can adequately represent

11   the Bond Sellers. . . .'  Id., paras. 37 and 38.  The SAC seeks relief on behalf of

12   the following proposed classes: 'all persons residing within the State of California

13   who have, within the last four years, conducted business with Defendants arising

14   out of the solicitation, sale and/or issuance of immigration bonds by Defendants,'

15   and 'all persons or entities who have, within the last four years, solicited, sold

16   and/or issued immigration bonds within California with the proper California State

17   licensure.' (Id.)"[98]

18       The paragraphs of the second amended complaint that are quoted in the notice are

19   substantially similar to allegations that appeared in the first amended complaint.  For instance,

20   paragraph 29 of the first amended complaint alleges: "Plaintiffs are informed and believe, and

21   *based thereon allege on behalf of themselves and all others similarly situated*, that Defendants,

22   and each of them, have committed and are continuing to commit acts of unfair competition as

23   defined by Business and Professions Code § 17200 . . . ."[99]  Paragraph 30 states: "The definition

24   of the class of individuals that are similarly situated with respect to Plaintiffs, based upon

25   information and belief at the time of this First Amended Complaint, is as follows: all persons who

26   _____

27       [98]Defs.' Notice of Removal, ¶ 13.

28       [99]Id., Exh. 4 (First Amended Complaint, ¶ 29 (emphasis added)).

24

have, within the last four years, conducted business with Defendants arising out of the solicitation, sale and/or issuance of immigration bonds by Defendants."[100]  Paragraph 31 asserts that "[t]he Bond Purchasers are so numerous that joinder of each such person[ ] and/or entity would be impracticable, and the disposition of their claims in this action, rather than in numerous individual actions, will benefit the parties, the Court and the interests of justice."[101]  Finally, paragraph 33 alleges that "[t]here is a well defined community of interest in the questions of law and fact involved affecting the Bond Purchasers, in that Defendants' unlawful solicitation, sale and issuance of immigration bonds has affected all Bond Purchasers."[102]

Defendants contend that the changes made to the parameters of the putative class(es) and representatives are jurisdictionally significant, and argue that the action did not become removable as a result of the first amended complaint because G&G failed to establish standing to represent a proposed class of Bond Purchasers.  Defendants stress that this defect was so fundamental that the state court sustained a demurrer to the claim.[103]

Defendants apparently argue that a pleading to which a demurrer is sustained for failure to state a claim cannot, as a matter of law, provide adequate notice of removability.  They cite no case law supporting this proposition, however, and the court has found none.[104]  Section

---

[100]*Id.*, Exh. 4 (First Amended Complaint, ¶ 30).

[101]*Id.*, Exh. 4 (First Amended Complaint, ¶ 31).

[102]*Id.*, Exh. 4 (First Amended Complaint, ¶ 33).

[103]See Defs.' Opp. at 18-19.

[104]Indeed, after removing the case to federal court, defendants promptly filed a Rule 12(b)(6) motion to dismiss the second amended complaint for failure to state a claim upon which relief could be granted.  (See Defendants' Notice of Motion and Motion to State a Claim Upon Which Relief Can Be Granted (FRCP 12(b)(6).)  The motion asserts that: (1) plaintiffs' UCL claim is barred as a matter of law under the doctrine of federal preemption; (2) plaintiffs' UCL claim fails because they lack standing; (3) plaintiffs' UCL claim fails to state facts sufficient to constitute a claim for relief against defendants because plaintiffs have failed to allege facts establishing unlawful, unfair or fraudulent conduct; (4) plaintiffs' UCL claim is barred as a matter of law for failure to exhaust available administrative remedies; (5) plaintiffs' UCL claim is not ripe for review under the doctrine of primary jurisdiction; (6) G&G's claim for intentional

25

1    1446(b) clearly provides that the thirty-day clock starts to run when defendants receive a pleading

2    that first enables them to ascertain whether "the case is one which is or has become removable."

3    28 U.S.C. § 1446(b).  The allegations in the first amended complaint put defendants on notice that

4    plaintiffs sought to bring a class or mass action on their own behalf and on behalf of others

5    similarly situated that challenged allegedly unlawful business practices in defendants' solicitation,

6    issuance, and sale of immigration bonds.  No factual investigation or discovery was necessary to

7    ascertain this fact.

8           Even if, as defendants contend, it was obvious from the face of the first amended

9    complaint that G&G could not represent a putative class of Bond Purchasers, it was clear that

10   Orellana could.  Defendants' demurrer, in fact, did not challenge her standing as a class

11   representative.[105]  For these reasons, the court concludes that the first amended complaint

12   provided the necessary allegations, from which defendants could have ascertained whether the

13   action qualified as a class or mass action under CAFA.

14          Similarly, none of the changes made in the second amended complaint provided additional

15   information regarding the amount in controversy in the case.  In support of their contention that

16   the amount in controversy exceeds $5 million, defendants' removal notice cites several paragraphs

17   of the second amended complaint.[106]  The first amended complaint contains substantially similar

18   _____

19   interference with prospective economic advantage fails to state facts constituting a cause of action;
     and (7) G&G's claim for negligent interference with economic advantage likewise fails to state
20   a claim for relief.  (Id. at 2-3.)  These arguments are nearly identical to those raised in
     defendants' demurrer to the first amended complaint.
21

22   [105]See Defs.' Notice of Removal, Exh. 6 (Defs.' Demurrer at 6).

23   [106]Id., ¶ 15 ("Specifically, Plaintiffs allege that:
24        •    'Both the Bond Purchasers and Bond Sellers are so numerous that joinder
               of each such person[ ] and/or entity would be impracticable, and the
25             disposition of their claims in this action, rather than in numerous individual
               actions, will benefit the parties, the Court and the interests of justice' (Ex.
26             '1,' SAC, para. 34.)
27        •    'The Bond Purchasers have been substantially injured by the unlawful,
               unfair, and fraudulent business practices of Defendants, and each of them.
28             . . . The Bond Sellers have also been substantially injured by the unlawful,

                                                   26

1  allegations.[107]   Because defendants have identified no "other paper" received after the first

2  amended complaint that provided essential new information about the amount in controversy,

3  defendants have failed to meet their burden of establishing federal removal jurisdiction.  See

4  *Matheson*, 319 F.3d at 1091; *Sanchez*, 102 F.3d at 404; *Gaus*, 980 F.2d at 566-67.

5       In conclusion, the court finds that the first amended complaint was the operative pleading

6  that gave rise to federal removal jurisdiction.  The court must next consider whether the late entry

7  of Lexington into the case excuses the FAC Defendants' failure to file their notice of removal

8  within thirty days of service of the first amended complaint.

9

10             unfair, and fraudulent business practices of Defendants, and each of them.'
              (Id., paras. 39 and 40.)

11     •     'By utilizing the 'referral' system . . . Fidelity National (which is not

12           authorized to write commercial surety insurance in California) and
             Lexington allow Bankers Surety (which is also not licensed or authorized to

13           transact insurance business in California) to manage their immigration bond

14           program. . . . Defendants' conduct is designed to and/or actually
             circumvents the law (and, in particular, the California Department of

15           Insurance's regulatory scheme). . . .' (Id., para. 26.)

16     •     'Plaintiffs seek restitution, as well as actual, punitive, statutory and treble
             damages on behalf of themselves and the putative class. (Id., para. 6 and

17           at 12.)").

18  [107]See *id.*, Exh. 4 (First Amended Complaint, ¶ 31 ("The Bond Purchasers are so

19  numerous that joinder of each such persona and/or entity would be impracticable, and the
    disposition of their claims in this action, rather than in numerous individual action, will benefit

20  the parties, the Court and the interests of justice"), ¶ 34 ("The Bond Purchasers have been

21  substantially injured by the unlawful, unfair, and fraudulent business practices of Defendants, and
    each of them"), ¶ 35 ("G&G has also suffered injury in fact in the State of California as a result

22  of Defendants' conduct as alleged hereinabove"), ¶ 24 ("By utilizing the 'referral' system set

23  forth above, Fidelity National (which is not authorized to write commercial surety insurance in
    California) allows Banker Surety (which is also not licensed or authorized to transact insurance

24  business in California) to manage its immigration bond program. . . . Defendants' conduct is
    designed to and/or actually circumvents the California Department of Insurance's regulatory

25  scheme"), ¶ 38 ("Plaintiffs, also on behalf of themselves and others similarly situated, seek an

26  order of restitution pursuant to Business & Professions Code § 17203, requiring Defendants to
    disgorge any and all monies, premiums, renewal premiums, administrative expenses, cash

27  collateral, real property, and the like, which have been collected by Defendants from Plaintiffs
    and members of the public similarly situated as a result of Defendants' unlawful, unfair, and

28  fraudulent business practices described herein")).

                                                  27

1        2.    **Whether The "First-Served Rule" Prevents Removal**

2        There is a split of authority as to whether § 1446(b) requires that removal be affected

3    within thirty days after the first defendant is served, or whether a defendant that is subsequently

4    served may remove within thirty days of its receipt of summons and complaint. See *Garside v.*

5    *Osco Drug, Inc.*, 702 F. Supp. 19, 21 (D. Mass. 1988) (comparing 14A C. Wright, A. Miller

6    & E. Cooper, FEDERAL PRACTICE AND PROCEDURE, § 3731 (2d ed. 1985) (subsequently served

7    defendant should be allowed to remove) with 1 J. Moore, B. Ringle & E. Wicker, MOORE'S

8    FEDERAL PRACTICE, ¶ 0.168[3.-2-1] (2d ed. 1987) (subsequently served defendant cannot

9    remove)).

10        A majority of courts, however, apply the "first-served" rule, and hold that, where the first

11    served defendant has a right to remove but fails to do so within thirty days, later-served

12    defendants lose the right to remove after *they* are served. See *Brown v. Demco, Inc.*, 792 F.2d

13    478, 482 (5th Cir. 1986) ("The general rule . . . is that 'if the first served defendant abstains

14    from seeking removal or does not effect a timely removal, subsequently served defendants cannot

15    remove due to the rule of unanimity among defendants which is required for removal'"). See also

16    W. Schwarzer, A. Tashima & J. Wagstaffe, FEDERAL CIVIL PROCEDURE BEFORE TRIAL, ¶ 2:905

17    (The Rutter Group 2002) ("The 30-day removal period runs for *all* defendants from the date *the*

18    *first of them* receives the original complaint. If that defendant fails to remove the action within

19    30 days, *later-served defendants cannot remove!*" (emphasis original)). This rule effectuates the

20    unanimity requirement for removal. See *Brown*, 792 F.2d at 482; see also *New York Life Ins. Co.*

21    *v. Deshotel*, 142 F.3d 873, 887 n. 4 (5th Cir. 1998) (quoting *Brown*); *Hooper v. Albany Int'l.*

22    *Corp.*, 149 F.Supp.2d 1315, 1319 n. 2 (M.D. Ala. 2001) ("The purpose of the first served

23    defendant rule, which requires that all served defendants join in a notice of removal within thirty

24    days of service upon the first defendant, is to promote unanimity among the served defendants

25    'without placing undue hardships on subsequently served defendants'"); *D. Kirschner & Sons,*

26    *Inc. v. Continental Cas. Co.*, 805 F.Supp. 479, 481 (E.D. Ky. 1992) ("The general rule is that,

27    if the first-served defendant abstains from seeking removal or does not effect a timely removal,

28    subsequently served defendants cannot remove. . . . This result is due to the rule of unanimity

1    among defendants required for removal, which rule provides that 'all defendants who may

2    properly join in the removal petition must join'").

3          The Ninth Circuit has not squarely resolved this issue. See *United Computer Systems, Inc.*

4    *v. AT&T Corp.*, 298 F.3d 756, 763, n. 4 (9th Cir. 2002) ("There is currently a split of authority

5    on the construction of § 1446(b) when applied to multiple defendants. . . .  Because proper

6    resolution of this issue requires that all defendants be properly joined, we express no opinion

7    today on the propriety of either rule"); see also *McAnally Enterprises, Inc. v. McAnally*, 107

8    F.Supp.2d 1223, 1226 (C.D. Cal. 2000) ("Courts are split on applying the thirty-day rule to cases

9    with multi-defendants.  The Ninth Circuit has not yet addressed the issue.  The majority of courts

10   have held that the thirty-day removal period begins to run for all defendants on the date the first

11   defendant receives the initial complaint – the 'first-served' rule").  District courts in the circuit,

12   however, routinely apply the majority rule.  See, e.g., *Gennock v. Warner-Lambert Co.*, 208

13   F.Supp.2d 1156, 1159 (D. Nev. 2002) ("In this case, the first defendant served was Sav-on and

14   they were served on February 21, 2002.  Therefore, this meant that all Defendants had 30 days

15   to join in a notice of removal"); *McAnally Enterprises*, 107 F.Supp.2d at 1230 ("[T]he Court

16   applies the first-served rule and concludes that Defendant's removal was untimely"); *Biggs Corp.*

17   *v. Wilen*, 97 F.Supp.2d 1040, 1045 (D. Nev. 2000) ("All served defendants must join in the

18   removal and since the notice of removal must be filed within thirty days of service on the first

19   defendant, all served defendants must join in the removal no later than 30 days from the day on

20   which the first defendant is served"); *Teitelbaum v. Soloski*, 843 F.Supp. 614, 615 (C.D. Cal.

21   1994) ("Because all defendants must join, the 30-day period for removal commences to run from

22   the date the first defendant receives a copy of the complaint").[108]

23   _____

24        [108]Although defendants do not dispute that the majority of courts in this circuit apply the
     first-served rule, they urge the court to adopt the rationale of *Ford v. New United Motors Mfg.,*
25   *Inc.*, 857 F.Supp. 707 (N.D. Cal. 1994), and apply the last-served rule. (See Defs.' Opp. at 20-
     21.)  In *Ford*, a district court in the Northern District of California followed the Fourth Circuit's
26   reasoning that "there is nothing in the language or legislative history of section 1446(b) which
     supports the notion that the decision to remove rests exclusively with the first-served defendant."
27   *Id.* at 709 (citing *McKinney v. Board of Trustees of Maryland Community College*, 955 F.2d 924,

28

29

1    In this case, the FAC Defendants were served with the first amended complaint on

2  November 16, 2005.  The notice of removal was filed on March 17, 2006.  Applying the first-

3  served rule, the removal was tardy by four months.  Because defendants' removal violated

4  § 1446(b), the court must remand the case to state court.

5

6

7  926 (4th Cir. 1992)).  The *Ford* court opined that "the often-used 'unanimity' rationale does not

8  logically support the harsh [first-served] rule," and that "[a] rule which bars a defendant which

9  has waived its right to initiate the removal from later consenting to a removal filed by another
   defendant . . . does not in any way detract from the purpose of nor contravene the unanimity

10 requirement." *Id.* The *Ford* court rejected the argument that "the interests of settling the forum
   early in the litigation and avoiding forum shopping by the defendants" justified "foreclosing

11 subsequently-served defendants['] . . . statutory right to remove an action," and explained that

12 when to sue, whom to sue, and when to serve the complaint remain the exclusive province of the
   plaintiff.  *Id.* at 710.  Finally, the court observed that the last-served rule would minimize

13 prejudice to defendants because "such a rule w[ould] preclude plaintiffs from circumventing the
   rights afforded to defendants by deliberately manipulating the timing of service in an effort to

14 secure a state forum." *Id.*

15    The court does not find the reasoning of *Ford* persuasive.  First, while it is true that
   nothing in the language or legislative history of § 1446(b) indicates that Congress intended to have

16 courts employ a first-served rule, its silence does not show that Congress favored the last-served

17 rule.  Indeed, as the *Ford* court acknowledged, "[i]f Congress had intended the thirty-day removal
   period to commence in all cases upon service of the [last] defendant, it could have easily stated

18 as such." *Id.* at 709.  Second, although the *Ford* court correctly noted that the unanimity rule
   requires only that all defendants consent to removal, and not that each must file a notice of

19 removal, the court concludes that if the first-served defendant elects not to remove within the

20 statutory time period, it should not, in fairness, be permitted to change its position and consent
   to a later-served defendant's decision to remove the case.  See *Brown*, 792 F.2d at 482.

21    Third, the strong benefits of settling the forum early in the litigation process justify

22 adoption of the first-served rule.  While the first-served rule is susceptible of abuse by plaintiffs,
   the last-served rule is equally subject to manipulation by defendants.  The first-served rule,

23 however, ensures that preliminary disputes regarding forum will be resolved early in the
   litigation, rather than later.  The first-served rule therefore tends to discourage the type of

24 situation presented by this case – i.e., a situation in which the state court invests a significant

25 amount of time and effort in the case, only to have it removed months, even years, after filing.
   Finally, the court does not believe that the first-served rule is overly prejudicial to defendants.

26 In some ways, the first-served rule makes removal easier, because the first-served defendant will

27 have fewer consents to obtain.  For these reasons, and consistent with the view of the majority
   of courts in this circuit, the court concludes that it is appropriate to apply the first-served rule in

28 this case.

30

1

## IV.  CONCLUSION

2      For the reasons stated, the court grants plaintiffs' motion, and remands the action forthwith

3  to Los Angeles Superior Court.

4

5  DATED: June 12, 2006

6                                        MARGARET M. MORROW
                                    UNITED STATES DISTRICT JUDGE
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28